THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| R. WAYNE KLEIN, as Receiver,<br><br>Plaintiff,<br><br>v.<br><br>LAGRAND T. JOHNSON, an individual and trustee of the YOTSUYA FAMILY TRUST,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00534-DN-PK<br><br>District Judge David Nuffer |

This ancillary action to *United States v. RaPower-3, LLC et al.*, 2:15-cv-00828-DN-DAO (D. Utah) ("Civil Enforcement Case") is brought by Plaintiff R. Wayne Klein, who is the Court-Appointed Receiver ("Receiver") of RaPower-3, LLC ("RaPower"), International Automated Systems Inc. ("IAS"), LTB1, LLC ("LTB1"), their subsidiaries and affiliates,[1] and the assets of Neldon Johnson and R. Gregory Shepard.[2] The Civil Enforcement Case determined that the Receivership Entities were operated as an abusive tax fraud to enable funding for Neldon Johnson and his family. The Receiver's Complaint in this case asserts claims against Neldon Johnson's son, Defendant LaGrand T. Johnson, individually and as trustee of the Yotsuya Family Trust, to avoid alleged fraudulent transfers made to Defendant by the Receivership Entities or

---

[1] Collectively, unless stated otherwise, RaPower, IAS, LTB1, and all subsidiaries and affiliated entities are referred to as "Receivership Entities." The subsidiaries and affiliated entities are: Solco I, LLC ("Solco"); XSun Energy, LLC ("XSun"); Cobblestone Centre, LC ("Cobblestone"); LTB O&M, LLC; U-Check, Inc.; DCL16BLT, Inc.; DCL-16A, Inc.; N.P. Johnson Family Limited Partnership; Solstice Enterprises, Inc.; Black Night Enterprises, Inc.; Starlite Holdings, Inc.; Shepard Energy; and Shepard Global, Inc.

[2] Collectively, RaPower, IAS, LTB1, R. Gregory Shepard, and Neldon Johnson are referred to as the "Receivership Defendants."

others using the Receivership Entities' assets.[3] These transfers are alleged to have perpetuated and expanded the Receivership Defendants' fraudulent scheme.[4]

The Receiver seeks summary judgment on two of his claims for avoidance of fraudulent transfers under Utah's Uniform Voidable Transactions Act ("UVTA").[5] The Receiver argues that $2,328,527.84 in transfers to Defendant are voidable because they were made with actual intent to hinder, delay, or defraud creditors.[6] The Receiver also argues that certain transfers to Defendant are voidable because they were made when the Receivership Entities were insolvent and the Receivership Entities did not receive reasonably equivalent value for the transfers.[7]

The Undisputed Material Facts demonstrate that a $200,000 transfer to Defendant from Glenda Johnson using the Receivership Entities' assets was made with actual intent to hinder, delay, or defraud creditors. The Undisputed Material Facts also demonstrate that Glenda Johnson removed the assets from the Receivership Entities and made the $200,000 transfer to Defendant at a time the Receivership Entities were insolvent, and that reasonably equivalent value was not given for the transfer. Therefore, the $200,000 transfer is avoidable as a matter of law, and the Receiver's Motion for Partial Summary Judgment[8] is GRANTED in part.

The Undisputed Material Facts further demonstrate that $424,176.05 in transfers to Defendant (for commissions, bonuses, and consulting fees) were made with actual intent to

---

[3] Complaint, docket no. 2, filed July 26, 2019.

[4] *Id.*

[5] Receiver's Motion for Partial Summary Judgment, docket no. 39, filed Feb. 24, 2022. The UVTA became effective on May 9, 2017. The governing law prior to the UVTA was the Uniform Fraudulent Transfer Act. The statutes are substantially similar; any differences do not affect the disposition of the Receiver's Motion for Partial Summary Judgment. The statutes are referred to collectively as the UVTA, but citations to both statutes are given.

[6] *Id.* at 17-28.

[7] *Id.* at 29-30.

[8] Docket no. 39, filed Feb. 24, 2022.

hinder, delay, or defraud creditors. However, genuine issues of material fact exist regarding

Defendant's good faith defense for these transfers. And for the remaining $1,704,351.79 in

transfers to Defendant, genuine issues of material fact exist regarding whether the transfers were

made with actual intent to defraud,[9] and regarding Defendant's good faith defense. Therefore,

the Receiver's Motion for Partial Summary Judgment[10] is DENIED in part.

**Contents**

UNDISPUTED MATERIAL FACTS ........................................................................................ 4
    The Receivership Defendants' fraudulent scheme ............................................................ 4
    The Civil Enforcement Case against the Receivership Defendants.................................... 7
    Defendant's involvement with the Receivership Defendants and Receivership Entities . 10
    The Receivership Entities' financial condition ................................................................ 16
        IAS         .......................................................................................................... 16
        RaPower .................................................................................................................. 17
        Cobblestone ............................................................................................................. 18
STANDARD OF REVIEW .................................................................................................... 19
DISCUSSION ....................................................................................................................... 21
    The factual record of the Civil Enforcement Case is incorporated in this ancillary case . 21
    The Receiver has standing to seek avoidance of the transfers made to Defendant .......... 23
    The Receivership Entities' insolvency is relevant, but proving insolvency is not
        necessarily required ................................................................................................ 26
    $624,176.05 in transfers to Defendant were made with actual intent to hinder, delay, or
        defraud creditors .................................................................................................... 27
    Genuine issues of fact exist regarding whether Defendant took the $624,176.05 in
        fraudulent transfers in good faith ............................................................................ 33
    Genuine issues of material fact exist regarding whether reasonably equivalent value was
        given for $424,176.05 of the fraudulent transfers.................................................... 34
    Reasonably equivalent value was not given for the $200,000 fraudulent transfer made by
        Glenda Johnson ...................................................................................................... 36
    The Receiver is entitled to prejudgment interest on the $200,000 fraudulent transfer made
        by Glenda Johnson ................................................................................................. 37
    Genuine issues of material fact exist regarding the remaining $1,704,351.79 in transfers
        made to Defendant .................................................................................................. 38
ORDER ................................................................................................................................. 39

---

[9] This determination is consistent with the determinations in similar cases brought by the Receiver involving alleged fraudulent transfers made by the Receivership Entities. *See e.g., Klein v. Taylor*, No. 2:19-cv-00816-DN-PK, 2022 WL 580472 (D. Utah Feb. 25, 2022); *Klein v. Snow*, No. 2:19-cv-00757-DN-PK, 2022 WL 580457 (D. Utah Feb. 25, 2022).

[10] Docket no. 39, filed Feb. 24, 2022.

## UNDISPUTED MATERIAL FACTS[11]

### The Receivership Defendants' fraudulent scheme

1.      Neldon Johnson claimed to have invented solar energy technology, which involves solar lenses placed in arrays on towers.[12]

2.      To make money from this purported technology, Neldon Johnson sold a component of the technology, *i.e.*, the solar lenses.[13]

3.      Through a multi-level marketing model (using affiliated entity RaPower), lenses were sold to hundreds of investors across the nation.[14]

4.      IAS or RaPower agreed to build solar towers and install the customers' lenses at a site determined by IAS or RaPower.[15]

5.      When customers purchased lenses, the customers also signed an operations and maintenance agreement with LTB1, wherein LTB1 agreed to operate and maintain the customers' lenses to produce revenue.[16]

6.      LTB1 was to make quarterly payments to the lens purchasers, representing a portion of the revenues earned from the operation of the solar lenses.[17]

---

[11] Those facts, or portions thereof, identified in the parties' briefing that do not appear in these Undisputed Material Facts are either disputed; not supported by cited evidence; not material; or are not facts, but rather, are characterization of facts or legal argument. Additionally, self-serving and conclusory assertions within an affidavit or declaration are not accepted for purposes of raising a genuine dispute of a material fact. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).

[12] Findings of Fact and Conclusions of Law ("FFCL") ¶¶ 2-3 at 2, ECF no. 467 in Civil Enforcement Case, filed Oct. 4, 2018, docket no. 39-2, filed Feb. 24, 2022.

[13] *Id*. ¶ 27 at 6.

[14] *Id*. ¶ 44 at 8, ¶ 49 at 9.

[15] *Id*. ¶ 124 at 23, ¶ 126 at 23, ¶ 133 at 24, ¶¶ 144-145 at 26.

[16] *Id*. ¶ 16 at 4, ¶¶ 150-152 at 27.

[17] *Id*. ¶ 153 at 27.

7.     No customer ever decided to buy a lens and then lease it to an entity other than LTB1.[18]

8.     Customers never took direct physical possession of the lenses they purchased. Because the Receivership Defendants did not track which lens belonged to which customer, there was no way for a customer to know which specific lens or lenses they owned. No customer provided testimony that the owned lenses could be identified.[19]

9.     A bonus incentive program paid commissions or referral fees to persons who persuaded others to purchase the solar lenses.[20]

10.    Neldon Johnson illustrated his idea as follows:[21]



11.    Neldon Johnson's entities retained the lenses and controlled what happened to them, if anything.[22]

---

[18] *Id*. ¶ 336 at 64.

[19] *Id*. ¶¶ 337-338 at 64.

[20] *Id*. ¶¶ 28-30 at 6.

[21] *Id*. ¶ 292 at 57.

[22] *Id*. ¶ 339 at 64.

12.     The Receivership Defendants emphasized how little any customer would have to do with respect to "leasing out" their lenses: "[s]ince LTB[1] installs, operates and maintains your lenses for you, having your own solar business couldn't be simpler or easier."[23]

13.     The Receivership Defendants knew that they sold solar lenses to individuals who generally work full-time jobs, such as teachers, school administrators, coaches, and others. The Receivership Defendants knew, or had reason to know, that their customers did not have special expertise in the solar energy industry.[24]

14.     The Receivership Defendants advertised substantial returns and tax benefits in exchange for only a down payment on the solar lenses:[25]



---

[23] *Id*. ¶ 340 at 64.

[24] *Id*. ¶¶ 350-351 at 67.

[25] Plaintiff's Trial Exhibits 496, 497, and 777 in Civil Enforcement Case, docket no. 39-3, filed Feb. 24, 2022.

15.     The lens purchase program that the Receivership Defendants and Defendant solicited others to purchase was not registered as a security with the United States Securities and Exchange Commission or the Utah Division of Securities.[26]

### The Civil Enforcement Case against the Receivership Defendants

16.     On November 23, 2015, the United States filed the Civil Enforcement Case against the Receivership Defendants alleging that the Receivership Defendants operated a fraudulent solar energy scheme.[27]

17.     The Civil Enforcement Case determined that "[f]or more than ten years, the Receivership Defendants promoted an abusive tax scheme centered on purported solar energy technology featuring 'solar lenses' to customers across the United States. But the solar lenses were only the cover story for what the Receivership Defendants were really selling: unlawful tax deductions and credits."[28]

18.     The Receivership Defendants sold solar lenses emphasizing their purported tax benefits. Customers were told that they could "zero out" their federal income tax liability by buying enough solar lenses and claiming both a depreciation deduction and solar energy tax credit for the lenses.[29]

---

[26] Receiver's Declaration in Support of Motion for Summary Judgment ("Receiver's Declaration") ¶¶ 4-5 at 2-4, docket no. 39-4, filed Feb. 24, 2022. This fact is not disputed. Defendant denies that he solicited any person or entity to purchase lenses, but he admits that he received commission payments from lens sales referred or made by him to others. Defendant's Memorandum in Opposition to Motion for Summary Judgment ("Response") at 5, docket no. 48, filed Apr. 28, 2022; Declaration of LaGrand Johnson in Support of Defendant's Memorandum in Opposition to Motion for Summary Judgment ("LaGrand Johnson's Declaration") ¶ 2 at 2, ¶ 5 at 3, ¶¶ 28-29 at 7, docket no. 48-1, filed Apr. 22, 2022; LaGrand Johnson Deposition Transcript Aug. 30, 2021 ("LaGrand Johnson Depo.") at 49:21-50:18, docket no. 39-7, filed Feb. 24, 2022.

[27] Complaint for Permanent Injunction and Other Equitable Relief, ECF no. 2 in Civil Enforcement Case, filed Nov. 23, 2015.

[28] Memorandum Decision and Order on Receiver's Motion to Include Affiliates and Subsidiaries in Receivership ("Affiliates Order") ¶ 1 at 4, ECF no. 636 in Civil Enforcement Case, filed May 3, 2019; docket no. 39-5, filed Feb. 24, 2022.

[29] FFCL ¶ 203 at 35.

19.     The purported solar energy technology and solar lenses, however, did not work and could not generate marketable energy. Specifically, the Civil Enforcement Case determined that the "purported solar energy technology is not now, has never been, and never will be a commercial-grade solar energy system that converts sunlight into electrical power or other useful energy" and "[t]he solar lenses do not, either on their own or in conjunction with other components, use solar energy to generate [marketable electricity]."[30]

20.     None of these solar lenses ever met the necessary elements to qualify for depreciation deductions or the solar energy tax credit. Indeed, "[h]undreds, if not thousands" of customer lenses were not even removed from the shipping pallets.[31]

21.     Notwithstanding the fact the technology and solar lenses never worked, the Receivership Defendants continued to sell lenses to customers emphasizing that customers would qualify for depreciation deductions and/or the solar energy tax credit. Between 45,205 and 49,415 solar lenses were sold to customers.[32]

22.     The evidence adduced at the Civil Enforcement Case's trial demonstrated that the Receivership Defendants organized the solar energy scheme; made false or fraudulent statements about the tax benefits from purchasing the lenses; and that the Receivership Defendants knew, or

---

[30] *Id*. ¶¶ 261-264 at 49. This fact is not disputed. Defendant asserts that he observed components of the technology working as designed and generating energy. LaGrand Johnson's Declaration ¶ 3 at 2, ¶ 19 at 6. But whether certain components may have worked does not genuinely dispute that the technology and solar lenses did not work and could not generate marketable energy.

[31] FFCL ¶ 288 at 55, ¶¶ 407-413 at 81-83.

[32] *Id*. ¶ 79 at 14, ¶¶ 261-264 at 49. This fact is not disputed. Defendant asserts that he observed components of the technology work as designed and generating energy. LaGrand Johnson's Declaration ¶ 3 at 2, ¶ 19 at 6. But whether certain components may have worked does not genuinely dispute that the technology and solar lenses did not work and could not generate marketable energy.

had reason to know, that their statements were false or fraudulent pertaining to a material matter, *i.e.*, tax benefits of depreciation and solar energy tax credits.[33]

23.     The Receivership Defendants' own transaction documents and testimony at trial in the Civil Enforcement Case demonstrated that the gross receipts received by the Receivership Defendants were at least $32,796,196, and possibly much more.[34]

24.     Based on these facts and others, the Receivership Defendants were enjoined in the Civil Enforcement Case from promoting their abusive solar energy scheme; ordered to disgorge their gross receipts; and required to turn over their assets and business operations to the Receiver.[35]

25.     The Civil Enforcement Case determined that the "whole purpose of RaPower, IAS, and LBT1 . . . was to perpetuate a fraud to enable funding for Neldon Johnson. The same is true for other entities [Neldon] Johnson created, controls, and owns . . . . [Neldon] Johnson has commingled funds between these entities, used their accounts to pay personal expenses, and transferred Receivership Property to and through them in an attempt to avoid creditors."[36]

26.     "[T]he whole purpose of RaPower[] was to perpetrate a fraud to enable funding of the unsubstantiated, irrational dream of Nel[d]on Johnson. The same is true for the other entities

---

[33] Memorandum Decision and Order Freezing Assets and to Appoint a Receiver ("Freeze Order") at 15-16, ECF no. 444 in Civil Enforcement Case, filed Aug. 22, 2018, docket no. 39-6, filed Feb. 24, 2022.

[34] FFCL ¶¶ 80-86 at 15.

[35] Affiliates Order ¶ at 4; Freeze Order.

[36] Affiliates Order ¶ 2 at 4-5; FFCL at 128; Receiver's Report and Recommendation on Inclusion of Affiliates and Subsidiaries in Receivership Estate ("Receiver's Report and Recommendation") §§ B.4-5, B.7, B.10-13, F.4-5, F.7, F.10-13, ECF 581 in Civil Enforcement Case, filed Feb. 25, 2019. "Receivership Property" means "all property interests of each of the Receivership Defendants . . . . These property interests include, but are not limited to: monies, accounts, trusts, funds, digital currencies, securities, credits, stocks, bonds, effects, goods, chattels, intangible property (including patents and other intellectual property), real property, lands, premises, leases, claims, rights, ownership interests in domestic or foreign entities, and other assets, together with rents, profits, dividends, receivables, interest, or other income attributable thereto, of whatever kind, that the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly." Corrected Receivership Order ¶ 13.a at 7, ECF no. 491 in Civil Enforcement Case, filed Nov. 1, 2018.

[Neldon] Johnson established and used including IAS, SOLCO I, XSun Energy, Cobblestone, and the LTB entities."[37]

27.     "[The Receivership] Defendants have no legitimate business, [the Receivership] Defendants' solar energy scheme is an abusive tax scheme and not a legitimate business."[38]

28.     "[The Receivership] Defendants do not have any revenue or income aside from the sale of solar lenses."[39]

**Defendant's involvement with the Receivership Defendants and Receivership Entities**

29.     Defendant is the son of Neldon Johnson and was an insider of IAS (serving as the CFO from early 2000 until 2016), RaPower, and Cobblestone.[40]

30.     Defendant worked full time for IAS from approximately August 1996 until approximately December 2013.[41] He worked full time for IAS and Cobblestone from 2014 through 2018.[42]

31.     Defendant worked mostly in finance and financial reporting for IAS and did research and development at IAS, including but not limited to telemedicine; communication; fingerprint technology; self-checkout systems in grocery stores and restaurants; solar energy; and geothermal energy.[43]

32.     Before IAS started selling solar lenses, Defendant worked for IAS in the development of technologies, including an automated scanning till system for grocery stores; a

---

[37] FFCL at 128 (footnote omitted).

[38] Freeze Order at 18.

[39] *Id*. at 19.

[40] LaGrand Johnson Depo. at 30:14-21; Utah Code Ann. § 25-6-102(8) (formerly Utah Code Ann. § 25-6-2(8) (2016)).

[41] *Id*. at 12:22-25; LaGrand Johnson's Declaration ¶ 13 at 5.

[42] LaGrand Johnson's Declaration ¶ 20 at 6.

[43] *Id*. ¶ 14 at 5.

biometric pickup device (fingerprint scanner); an automated controlled substance vending machine for grocery stores; an automated food ordering restaurant; a bladeless steam turbine; a high pressure/temperature steam rocket nozzle design; high temperature/pressure steam boilers; a biomass burner; a high temperature oil heat exchanger; and a high temperature molten salt heat exchanger.[44]

33.     Defendant also performed consulting work for RaPower and Cobblestone regarding the solar technology, such as consulting on land purchasing areas; where the best places to develop the solar projects might be; and feasibility of particular locations.[45]

34.     Defendant's responsibilities with Cobblestone (which was organized to assemble IAS's product, specifically, the construction and assembly of solar towers) included overseeing the finances; the operations, including lens design, construction, and assembly; and the assembly of the solar arrays in Delta, Utah.[46]

35.     Defendant's activities with Cobblestone included development of the support systems for the solar towers, such as tracking systems; hydraulic systems; transfer fluids; photovoltaic cells; a turbine; high pressure/temperature steam rocket nozzle design; high temperature/pressure steam boilers; biomass burner; high temperature oil heat exchanger; high temperature molten salt heat exchanger; solar optic acrylic lens design; solar optic imprint roller design; special diamond cutting tooling; solar tracking design; solar frame work design; solar photovoltaic pickup design; and other parts of the solar energy production system.[47]

---

[44] *Id*. ¶ 30 at 6.

[45] *Id*. ¶ 15 at 5.

[46] *Id*. ¶¶ 16-17 at 5, LaGrand Johnson Depo. at 59:4-16.

[47] LaGrand Johnson's Declaration ¶ 18 at 5.

36.     Defendant was intimately involved in the development of the solar energy equipment, including the design and production of the Fresnel lens; the design and construction of various solar towers; the design and implementation of the solar tracking system; the design and production of the bladeless turbine; and the design and development of the photovoltaic cells.[48]

37.     During the time Defendant worked for IAS and Cobblestone, he observed success in several components of the solar technology, including capturing solar energy heat from the lenses, which was then used to generate steam that was forced through a bladeless turbine that was hooked up to a load monitor and a bank of resistors before passing to a bank of automotive car lights. The electricity created burned out all the components.[49]

38.     Defendant also acted as a salesperson for the Receivership Entities and sold solar lenses based on a claim that the purchases qualified for depreciation deductions or solar energy tax credits.[50]

39.     Defendant received commissions from the Receivership Entities for the sale of solar lenses from 2010 to 2017, in the amount of $6,176.05.[51]

---

[48] *Id*. ¶ 31 at 7-8.

[49] *Id*. ¶ 19 at 6. Defendant's asserted subjective beliefs regarding the viability of the technology are not undisputed material facts. It is undisputed that the technology and solar lenses did not work and could not generate marketable energy. *Supra*, Undisputed Material Facts ¶ 19 at 8; *infra*, Undisputed Material Facts ¶ 63 at 17. Additionally, good faith is "measured objectively" based on whether "the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and [whether] diligent inquiry would have discovered the fraudulent purpose." *Wing v. Layton*, 957 F. Supp. 2d 1307, 1319 (D. Utah 2013) (quoting *Jobin v. McKay*, 84 F.3d 1330, 1338 (10th Cir. 1996)). "A transferee who reasonably should have known of a debtor's insolvency or of the fraudulent intent underlying the transfer is not entitled to a finding of good faith." *Id*. (quoting *Jobin*, 84 F.3d at 1338). Defendant's good faith is disputed. *Infra*, Discussion at 33-34, 38-39.

[50] LaGrand Johnson Depo. at 49:21-50:3. This fact is not disputed. Defendant denies that he acted as a salesperson, but he admits that he received commission payments from lens sales referred or made by him to others. Response at 10; LaGrand Johnson's Declaration ¶¶ 2 at 5, 5 at 3, 28-29 at 7; LaGrand Johnson Depo. at 49:21-50:18.

[51] Receiver's Declaration ¶ 7 at 4; Consolidated Entities Payments to LaGrand Johnson, docket no. 39-17, filed Feb. 24, 2022; LaGrand Johnson's Declaration ¶ 28 at 7.

40.     Defendant was not licensed under state or federal securities law to sell securities.[52]

41.     Defendant received transfers from IAS, RaPower, and Cobblestone and other entities from 2005 to 2018, in the amount of $2,128,527.84.[53]

42.     The transfers to Defendant, according to the Receivership Entities' records and the Receiver's review of those records, are categorized as follows:

- $6,176.05 in commissions for selling solar lenses;
- $85,019.36 in cash payments;
- $358,000.00 in bonuses;
- $60,000.00 for consulting;
- $364,957.52 in wages, salary, and benefits;
- $314,086.46 for research and development and reimbursements;
- $940,288.45 for other payments.[54]

43.     The salary and bonus payments to Defendant were for handling the finances for IAS and developing the solar technology and other technology for Neldon Johnson's business.[55]

44.     The $314,086.46 in transfers to Defendant identified as "research and development and reimbursements" were reimbursements for expenses that Defendant paid for such as office supplies; equipment; and other payments Defendant made on behalf of IAS and Cobblestone that were incurred on his personal credit card. Defendant made those payments on the understanding that he would be reimbursed for his expenditures.[56]

---

[52] *Id*. at 10:18-25.

[53] Receiver's Declaration ¶ 6 at 4; Consolidated Entities Payments to LaGrand Johnson.

[54] Receiver's Declaration ¶ 7 at 4; Consolidated Entities Payments to LaGrand Johnson.

[55] LaGrand Johnson Depo. at 13:1-5; 22:13-23:20, 49:12-20, 59:4-16.

[56] *Id*. at 68:6-69:9; LaGrand Johnson's Declaration ¶ 25 at 6-7; Receiver's Declaration ¶ 7 at 4; Consolidated Entities Payments to LaGrand Johnson.

45.     All wages and other compensation received by Defendant from IAS, Cobblestone, and related entities was provided for contemporaneous services he provided to those businesses at the time.[57]

46.     On June 22, 2018, immediately after closing arguments in the Civil Enforcement Case's bench trial, partial findings of fact and an initial ruling were entered from the bench, concluding that the Receivership Defendants engaged in a "massive fraud" for which they would be enjoined, and disgorgement would be ordered.[58]

47.     On June 22, 2018, Glenda Johnson transferred $140,000.00 from the RaPower bank account at Bank of American Fork (account ending #1198)[59] to the Cobblestone bank account at Bank of American Fork (account ending #3739).[60]

---

[57] LaGrand Johnson's Declaration ¶ 26 at 7. Defendant's asserted subjective beliefs regarding the work he provided and its value are not undisputed material facts. Good faith is "measured objectively" based on whether "the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and [whether] diligent inquiry would have discovered the fraudulent purpose." *Layton*, 957 F. Supp. 2d. at 1319 (quoting *Jobin*, 84 F.3d at 1338). "A transferee who reasonably should have known of a debtor's insolvency or of the fraudulent intent underlying the transfer is not entitled to a finding of good faith." *Id*. (quoting *Jobin*, 84 F.3d at 1338). Defendant's good faith is disputed. *Infra*, Discussion at 33-34, 38-39. Additionally, Defendant's efforts in performing work are not the relevant inquiry for determining whether reasonably equivalent value was given for a transfer. Rather, "the focus is on whether the debtor received reasonably equivalent value from the transfer." *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1276 (D. Utah 2015). "The primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved." *Klein v. Cornelius*, 786 F.3d 1310, 1321 (10th Cir. 2015). "The UFTA states that '[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied.'" *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1199 (10th Cir. 2022) (quoting Utah Code Ann. § 25-6-4 (2016)). It is disputed whether the Receivership Entities received reasonably equivalent value for the transfers to Defendant. *Infra*, Discussion at 35-36, 38-39.

[58] FFCL at 1-2; Bench Trial Transcript at 2515:5-11, docket no. 39-14, filed Feb. 24, 2022.

[59] RaPower-3, LLC Account Statement June 2018, docket no. 39-8, filed Feb. 24, 2022.

[60] Cobblestone Centre, LC Account Statement June 2018, docket no. 39-9, filed Feb. 24, 2022.

48.     On June 22, 2019, Glenda Johnson transferred $1,945,500.00 from the Cobblestone bank account at Bank of American Fork (account ending #1206)[61] to her personal bank account at Bank of American Fork (account ending #2790).[62]

49.     After depositing the $1,945,500.00 into her #2790 account on June 22, 2018, the account balance of the #2790 account was $2,216,275.60.[63]

50.     There have been no other deposits in Glenda Johnson's #2790 account since June 22, 2018.[64]

51.     Over the next 11 months, there was a depletion of the funds in Glenda Johnson's #2790 account, including a $200,000.00 transfer to Defendant.[65]

52.     Defendant was aware that the Receivership Defendants were being investigated by the IRS. He knew of the IRS's 2012 criminal raid on the Receivership Defendants' operations in Delta, Utah.[66]

53.     Defendant was aware that IAS had not received any revenue from 2005 through 2018, except from the sale of stock and solar lenses.[67]

54.     Defendant reported the wages and income he received from the Receivership Entities on his taxes. Defendant is current in his tax filings.[68]

---

[61] *Id*.

[62] Glenda E. Johnson Account Statements June 2018-May 2019, docket no. 39-10, filed Feb. 24, 2022.

[63] *Id*.

[64] *Id*.

[65] *Id*.

[66] LaGrand Johnson Depo. at 129:25-130:13.

[67] *Id*. at 39:3-20.

[68] LaGrand Johnson's Declaration ¶ 23 at 6. Defendant's asserted subjective beliefs regarding his tax filings are not undisputed material facts. Good faith is "measured objectively" based on whether "the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and [whether] diligent inquiry would have discovered the fraudulent purpose." *Layton*, 957 F. Supp. 2d. at 1319 (quoting *Jobin*, 84 F.3d at 1338). "A transferee who reasonably should have known of a debtor's insolvency or of the fraudulent intent underlying the transfer is not

55.     Defendant's compensation from the Receivership Entities is less than he would have earned as a doctor during those same years.[69]

56.     During his years of employment with IAS (between 2006 and 2010), Defendant contributed approximately $1,144,000.00 to IAS, which Defendant had obtained from his sale of IAS stock.[70]

### The Receivership Entities' financial condition

**IAS**

57.     IAS was a public company and filed annual reports that included audited financial statements. The most recent annual report filed by IAS was for 2016. In that report, IAS indicated that it had $0.00 revenue for the most recent fiscal year.[71]

58.     IAS indicated that as of the date of its annual report for 2016, it had "not marketed any commercially acceptable products" and "will continue to need additional operating capital either from borrowing or from the sale of additional equities."[72]

59.     IAS also indicated that "[s]ince inception, we have incurred operating losses each year of our operations and we expect to continue to incur operating losses for the next several years. We may never become profitable."[73]

---

entitled to a finding of good faith." *Id*. (quoting *Jobin*, 84 F.3d at 1338). Defendant's good faith is disputed. *Infra*, Discussion at 33-34, 38-39.

[69] LaGrand Johnson's Declaration ¶ 24 at 6.

[70] *Id*. ¶ 27 at 7; Preliminary Hearing Re: Contempt and Sanction Transcript Jan. 23, 2020 at 90:2-95:23, docket no. 51-2, filed May 26, 2022.

[71] IAS Annual Report for Fiscal Year Ended June 30, 2016 at 2, docket no. 39-11, filed Feb. 24, 2022.

[72] *Id*. at 12.

[73] *Id*. at 15.

60.     As of June 30, 2016, IAS indicated that it had accumulated deficits of $40,156,398 with only $3,997,445 in total assets.[74]

61.     IAS's annual report for 2016 also states that "[t]he accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has suffered recurring losses from operations that raises a substantial doubt about its ability to continue as a going concern."[75]

**RaPower**

62.     RaPower's revenue came from the sale of solar lenses.[76]

63.     Neldon Johnson's technology never generated marketable electricity or revenue from the sale of power.[77]

64.     The obligation of investors to make payments from the purchase of the solar lenses (beyond the initial down payment) was conditioned on receiving income from the use of the lenses in producing solar power.[78]

65.     RaPower was liable to lens purchasers to refund the purchase price for lenses if customers wanted their money back.[79]

---

[74] *Id*. at 21-22.

[75] *Id*. at 37.

[76] FFCL at 87, ¶ 50 at 9, ¶ 79 at 14.

[77] *Id*. ¶¶ 292-315 at 57-60.

[78] *Id*. at 99, 101, 115-116, ¶ 20 at 5, ¶¶ 143-171 at 26-29, ¶¶ 329-334 at 63; Declaration of Steven R. Checketts in Support of Receiver's Motion for Summary Judgment ("Checketts's Declaration") ¶ 4 at 2, docket no. 39-12, filed Feb. 24, 2022.

[79] FFCL at 102, 114-116, ¶ 135 at 24, ¶ 171 at 29, ¶¶ 330-334 at 63, ¶ 360 at 69-70. Defendant's bald denial does not create a genuine dispute of this fact. Response at 16. Defendant does not cite evidence to support his belief that only a few lens purchasers were entitled to a refund. LaGrand Johnson's Declaration ¶ 12 at 4. Nor does Defendant cite evidence for his assertion regarding the contents of the purchase agreements for lens purchases. *Id*.

66.     Under generally accepted accounting principles in the United States ("GAAP"), revenue is not recognized until the entity "satisfies a performance obligation by transferring a promised good or service (that is, an asset) to a customer."[80]

67.     GAAP would not permit any revenue to be recognized by RaPower until the solar generating systems were in place and operating because the solar lenses were never transferred to the customers' possession and there was no intent to do so based on the operations and maintenance agreements entered by customers of RaPower indicating that LTB1 would operate and maintain the customers' lenses to produce revenue.[81]

68.     Under GAAP, RaPower should have recorded the entire amount of customers' cash deposits as customer deposit liabilities, with no additional amounts recognized as either revenue or account receivable until RaPower fulfilled its performance obligations by using the lenses to generate revenues from electricity production.[82]

**Cobblestone**

69.     Cobblestone had no source of income from any legitimate business operations. Over 99.8% of the money Cobblestone received came from other Receivership Defendants and insiders.[83]

---

[80] Checketts's Declaration ¶ 5 at 2.

[81] *Id*. ¶ 6 at 2; *Supra*, Undisputed Material Facts ¶¶ 4-8 at 4-5, ¶¶ 11-13 at 5-6. Defendant's bald denial does not create a genuine dispute of this fact. Response at 16. Defendant does not challenge the opinion of the Receiver's expert and Defendant presents no evidence to dispute the expert's opinion.

[82] Checketts's Declaration ¶ 7 at 2. Defendant's bald denial does not create a genuine dispute of this fact. Response at 16. Defendant does not challenge the opinion of the Receiver's expert and Defendant presents no evidence to dispute the expert's opinion.

[83] Receiver's Declarations ¶ 9 at 5.

70.     Beginning in at least May 1, 2009, the combined debts of RaPower, IAS, Cobblestone, Solco, XSun, LBT1, LBT O&M, LLC, DCL16BLT, Inc., DCL-16A, Inc., NPJFLP, Solstice, Black Night, and Starlite were greater than the sum of their combined assets.[84]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[85] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way"[86] or "if a reasonable jury could return a verdict for the nonmoving party."[87] A fact is material if "it is essential to the proper disposition of [a] claim."[88] And in ruling on a motion for summary judgment, the factual record and all reasonable inferences drawn therefrom are viewed in a light most favorably to the nonmoving party.[89]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[90] If the moving party carries this initial burden, the nonmoving party "may not rest upon mere allegations or denials of [the] pleading[s], but must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which it carries the burden of proof."[91]

---

[84] Declaration of Richard Hoffman in Support of Receiver's Motion for Summary Judgment ("Hoffman's Declaration") ¶¶ 3-5 at 1-2, docket no. 39-13, filed Feb. 24, 2022. Defendant's bald denial does not create a genuine dispute of this fact. Response at 17. Defendant does not challenge the opinion of the Receiver's expert and Defendant presents no evidence to dispute the expert's opinion. LaGrand Johnson's Declaration ¶ 12 at 4.

[85] FED. R. CIV. P. 56(a).

[86] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[87] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations omitted).

[88] *Adler*, 144 F.3d at 670.

[89] *Id.*

[90] *Id.* at 670-71.

[91] *Universal Money Ctrs., Inc.*, 22 F.3d at 1529 (internal quotations and citations omitted; emphasis in original).

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient to defeat a properly supported motion for summary judgment."[92]

The Receiver seeks summary judgment on two of his avoidance of fraudulent transfers claims under Utah's Uniform Voidable Transactions Act ("UVTA").[93] The Receiver argues that $2,328,527.84 in transfers to Defendant are voidable because they were made with actual intent to hinder, delay, or defraud creditors.[94] The Receiver also argues that certain transfers are voidable because they were made when the Receivership Entities were insolvent and the Receivership Entities did not receive reasonably equivalent value for the transfers.[95]

Defendant argues that summary judgment must be denied because the Receiver lacks standing to seek disgorgement of the payments Defendant received.[96] Defendant also argues that genuine issues of material fact exist regarding the Receivership Entities' insolvency;[97] whether the transfers to Defendant were made with actual intent to defraud;[98] and whether Defendant took the transfers in good faith and provided the Receivership Entities with reasonably equivalent value.[99]

---

[92] *Id.* (internal quotations omitted).

[93] Receiver's Motion for Partial Summary Judgment.

[94] *Id.* at 17-28.

[95] *Id.* at 29-30.

[96] Response at 29-31.

[97] *Id.* at 22.

[98] *Id.* at 23-26.

[99] *Id.* at 26-29.

## DISCUSSION

### The factual record of the Civil Enforcement Case
### is incorporated in this ancillary case

Defendant challenges the Receiver's use of findings from the Civil Enforcement Case as undisputed material facts in this case, arguing that those findings are not material and cannot be used in this case because Defendant was not party to the Civil Enforcement Case.[100] Defendant is correct that the findings from the Civil Enforcement Case are not binding on him in this case. But the record in the Civil Enforcement Case is incorporated into this ancillary case.

This case—along with other actions brought by the Receiver—is ancillary to, and arose directly from, the Civil Enforcement Case.[101] The orders in the Civil Enforcement Case and their findings, along with the evidence cited to support the findings, provide the basis for the existence of the receivership. This includes findings that the Receivership Defendants promoted and operated an abusive tax scheme centered on purported solar energy technology; that the technology and solar lenses did not work; and that the Receivership Defendants' solar scheme was not a legitimate business. These findings were made against the Receivership Defendants after a 12-day bench trial and were affirmed by the Tenth Circuit Court of Appeals.[102]

Courts often incorporate the factual record of an underlying enforcement case into ancillary actions brought by a receiver.[103] The ability of district courts to use such materials is an important tool in receiverships because use of the existing record reduces the time necessary to settle disputes; decreases litigation costs; avoids duplication of work; and avoids inconsistent

---

[100] Response at 3-9, 14-17. Defendant does not make any evidentiary objection to the incorporation of the record in the Civil Enforcement Case. Rather, Defendant argues only that certain Undisputed Material Facts relating to the Civil Enforcement Case are not material, and that claim preclusion is not appropriate in this case. *Id.*

[101] General Order No. 19-003, Oct. 18, 2019 (D. Utah).

[102] FFCL at 1; *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1243 (10th Cir. 2020).

[103] *Hafen v. Evans*, No. 2:19-CV-00895-TC, 2021 WL 3501658, at *1 (D. Utah Aug. 9, 2021).

decisions.[104] The use of the record and undisputed conclusions from the underlying enforcement action avoids the expense, distraction, and complexity of relitigating undisputed—and appeal-affirmed—findings.

District courts have broad discretion in their supervisory role over equity receiverships involving numerous parties and complex transactions.[105] It is doubtful that equitable receiverships would function if it were necessary to relitigate the factual basis for the receivership every time an ancillary action was litigated. And incorporation of the underlying action's factual record is particularly appropriate when, as here, the defendant does not produce evidence to sufficiently challenge the factual record and findings of the underlying enforcement action.

Judicial notice of the record in the Civil Enforcement Case under Federal Rule of Evidence 201 is also appropriate. On summary judgment, district courts may "take judicial notice, whether requested or not, of its own records and files, and facts which are part of its public records."[106] "Judicial notice is particularly applicable to the [district] court's own records of prior litigation closely related to the case before it."[107]

---

[104] *Elliott,* 953 F.2d at 1566 (citing *SEC v. Wencke,* 783 F.2d 829, 837 (9th Cir. 1986)). For these reasons, all actions arising from the Civil Enforcement Case were initially ordered to be heard by the District Judge that presided over the Civil Enforcement Case. General Order, No. 19-003.

[105] *SEC v. Vescor Capital Corp.,* 599 F.3d 1189, 1194 (10th Cir. 2010) (district courts have "broad powers and wide discretion to determine relief in an equity receivership."); *SEC v. Capital Consultants, LLC,* 397 F.3d 733, 738 (9th Cir. 2005); *Fed. Trade Comm'n v. Noland,* No. CV-20-00047-PHX-DWL, 2020 WL 4530459, *7 (D. Ariz. Aug. 6, 2020) (discussing the need to avoid distracting satellite litigation in a receivership).

[106] *St. Louis Baptist Temple v. Fed. Deposit Ins. Corp.,* 605 F.2d 1169, 1172 (10th Cir. 1979) ("a district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial."); *Anderson v. Cramlet,* 789 F.2d 840, 845 (10th Cir. 1986); *Van Woudenberg v. Gibson,* 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson,* 248 F.3d 946 (10th Cir. 2001); *United States v. Ahidley,* 486 F.3d 1184, 1192 (10th Cir. 2007).

[107] *St. Louis Baptist Temple,* 605 F.2d at 1172.

Therefore, the record in the Civil Enforcement Case is construed as part of the record in this case. The findings of fact in the Civil Enforcement Case are not *binding* on Defendant. But because Defendant presents no or insufficient evidence to challenge the Undisputed Material Facts or the record evidence from the Civil Enforcement Case which are incorporated here, there is no need to "grind the same corn a second time."[108] The findings in the Civil Enforcement Case that Defendant has failed to dispute with sufficient evidence are made again in this case for purposes of this Memorandum Decision and Order, as reflected in the Undisputed Material Facts.

### The Receiver has standing to seek avoidance of the transfers made to Defendant

Defendant argues that the Receiver lacks standing to seek disgorgement of the transfers Defendant received.[109] This argument lacks merit.

The Receiver's claims for avoidance of the alleged fraudulent transfers made to Defendant require the existence of a creditor and a debtor.[110] Under the UVTA, a "creditor" is "a person that has a claim,"[111] and a "debtor" is "a person that is liable on a claim."[112] And a "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[113]

---

[108] *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 n.33 (5th Cir. 1978) (quoting *Aloe Creme Laboratories v. Francine Co.*, 425 F.2d 1295, 1296 (5th Cir. 1970)).

[109] Response at 29-31.

[110] Utah Code Ann. §§ 25-6-202(1), -203(1) (formerly numbered as Utah Code Ann. §§ 25-6-5(1), -6(1) (2016)); *Bradford v. Bradford*, 993 P.2d 887, 891 (Utah Ct. App. 1999).

[111] Utah Code Ann. § 25-6-102(4) (formerly numbered as Utah Code Ann. § 25-6-2(4) (2016)).

[112] *Id*. § 25-6-102(6) (formerly numbered as Utah Code Ann. § 25-6-2(6) (2016)).

[113] *Id*. § 25-6-102(3) (formerly numbered as Utah Code. Ann. § 25-6-2(3) (2016)).

The Receivership Entities that made the alleged fraudulent transfers to Defendant (or whose assets were used in the transfers) are the debtors in this case. The receivership estates of the Receivership Entities are the creditors. This is because a receiver may "sue to redress injuries to the entit[ies] in receivership."[114] Receivership entities that were abused by and operated as a fraudulent scheme qualify as defrauded creditors.[115] "[W]rongdoer[s] must not be allowed to profit from [their] wrong by recovering property that [they] had parted with in order to thwart [their] creditors [or in furtherance of their fraudulent schemes]."[116] "The appointment of the receiver remove[s] the wrongdoer from the scene."[117]

Once the wrongdoer "has been ousted from control of and beneficial interest in the [receivership entities] . . . [t]he [entities are] no more [the wrongdoer]'s evil zombies."[118] "Freed from [the wrongdoer's] spell [the receivership entities] bec[o]me entitled to the return of the moneys . . . that [the wrongdoer] had made the [entities] divert to unauthorized purposes."[119] Therefore, when the entities "created and initially controlled by [the wrongdoer] are controlled by a receiver whose only object is to maximize the value of the [entities] for the benefit of their investors and any creditors, [there is no] objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by [the wrongdoer]."[120]

This analysis derives from case law involving receiverships over entities that acted in Ponzi schemes. But this does not affect the analysis's application to this case. A finding of a

---

[114] *Cornelius*, 786 F.3d at 1316 (quoting *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995)).

[115] *Id*. at 1316-1317; *Scholes*, 56 F.3d at 754.

[116] *Scholes*, 56 F.3d at 754.

[117] *Id*.

[118] *Id*.

[119] *Id*.

[120] *Id*. at 755.

Ponzi scheme was not required for the appointment of the Receiver for the Receivership Entities.[121] More fundamentally though, the case law from which the analysis derives does not hold that the analysis is applicable only to situations involving Ponzi schemes. The rationale behind the analysis is equally applicable to the fraudulent scheme involving the Receivership Entities. The Receivership Entities were "evil zombie[s]" under the "spell" of those who controlled and operated them as a fraudulent scheme, thus causing injury to the Receivership Entities.[122]

The appointment of the Receiver removed the fraudulent actors from the control of and beneficial interest in the Receivership Entities. This "cleansed" the Receivership Entities, making their receivership estates "separate entities in the eyes of the law."[123] Therefore, the Receiver may now take actions to maximize the value of the Receivership Entities' receivership estates by bringing suit to recover assets that were fraudulently dissipated.[124] Defendant cites no binding precedent or sufficiently persuasive legal authority that a Ponzi scheme is a prerequisite for the Receiver to have standing or the ability to pursue his claims in this case.

The Receiver is the court-appointed receiver of the Receivership Entities, entities that were operated as and abused by a fraudulent scheme. The Receiver stands in the shoes of the defrauded Receivership Entities.[125] The creditors for the Receiver's fraudulent transfer claims are the receivership estates of the Receivership Entities. The debtors for the Receiver's

---

[121] There has been no adjudication regarding the existence or the absence of a Ponzi scheme relating to the fraudulent scheme involving the Receivership Entities—neither party has presented the issue for determination.

[122] *Scholes*, 56 F.3d at 754; *Cornelius*, 786 F.3d at 1316.

[123] *Perlman v. Am. Express Centurion Bank*, No. 19-61386-CIV-SMITH, 2020 WL 10181895, *4 (S.D. Fl. July 17, 2020).

[124] *Id*.

[125] *Cornelius*, 786 F.3d at 1316.

fraudulent transfer claims are the Receivership Entities. And the Receiver has standing to assert claims to avoid the fraudulent transfers the Receivership Entities or others using the Receivership Entities' assets made, including those allegedly made to Defendant.[126]

### The Receivership Entities' insolvency is relevant, but proving insolvency is not necessarily required

Defendant argues that summary judgment is inappropriate because genuine issues of material fact exist regarding the Receivership Entities' insolvency.[127] Defendant's argument lacks merit. Proving the Receivership Entities' insolvency is not necessarily required for avoidance of the alleged fraudulent transfers. And regardless, the Receiver has established that the relevant Receivership Entities were insolvent beginning in at least May 1, 2009.

The Receiver's Motion for Partial Summary Judgment seeks avoidance of alleged fraudulent transfers made to Defendant under Utah Code Ann. § 25-6-202(1)(a) and Utah Code Ann. § 25-6-5(1)(a) (2016).[128] Proving insolvency is not a necessary element of a fraudulent transfer claim under these statutes.[129] Rather, these statutes require that the Receiver prove there was "[a] transfer made or obligation incurred by a debtor . . . with actual intent to hinder, delay, or defraud any creditor of the debtor[.]"[130]

The insolvency of the Receivership Entities is relevant to determining whether there was actual intent to defraud in making transfers to Defendant.[131] But insolvency is one of several

---

[126] *Perlman*, 2020 WL 10181895, *4.

[127] Response at 22.

[128] Receiver's Motion for Partial Summary Judgment at 17-28.

[129] Proving the Receivership Entities' insolvency is a required element of the Receiver's fraudulent transfer claim under Utah Code Ann. § 25-6-203(1) and Utah Code Ann. § 25-6-8 (2016).

[130] Utah Code Ann. § 25-6-202(1)(a) (formerly Utah Code Ann. § 25-6-5(1)(a) (2016)).

[131] *Id*. § 25-6-202(2)(i) (formerly Utah Code Ann. § 25-6-5(2)(i) (2016)).

indicia or "badges of fraud" that are considered in determining actual intent to defraud.[132]

Therefore, the existence of factual issues regarding the Receivership Entities' insolvency would

not necessarily prevent entry of judgment in favor of the Receiver on his claims under Utah Code

Ann. § 25-6-202(1)(a) and Utah Code Ann. § 25-6-5(1)(a) (2016).

Regardless, Defendant does not address the Receiver's arguments regarding the

Receivership Entities' insolvency, nor does Defendant sufficiently challenge the Receiver's

evidence of the Receivership Entities' insolvency.[133] "A debtor is insolvent if, at fair valuation,

the sum of the debtor's debts is greater than all of the debtor's assets."[134] The Undisputed

Material Facts, which are supported by unrefuted expert opinion, demonstrate that under a

balance sheet analysis, many of the Receivership Entities (including RaPower, IAS,

Cobblestone, Solco, XSun, LBT1, LBT O&M, LLC, DCL16BLT, Inc., DCL-16A, Inc., NPJFLP,

Solstice, Black Night, and Starlite) were insolvent beginning in at least May 1, 2009.[135]

Therefore, the insolvency of these Receivership Entities is an indicia that the transfers to

Defendant made after May 1, 2009, were made with actual intent to defraud.[136]

### $624,176.05 in transfers to Defendant were made with actual intent to hinder, delay, or defraud creditors

Under the UVTA, a transfer is voidable if the debtor (in this case, the Receivership

Entities) made the transfer with "actual intent to hinder, delay, or defraud any creditor of the

debtor."[137] To determine if a transfer is made with actual intent to hinder, delay, or defraud,

---

[132] *Id*. § 25-6-202(2)(a)-(k) (formerly Utah Code Ann. § 25-6-5(2)(a)-(k) (2016)); *City Nat'l Bank, N.A. v. Breslin*, 175 F. Supp. 3d 1314, 1319 (D. Utah 2016).

[133] Receiver's Motion for Partial Summary Judgment at ¶¶ 44-57 at 14-16, 29-30.

[134] Utah Code Ann. § 25-6-103(1) (formerly Utah Code Ann. § 25-6-3(1) (2016)).

[135] *Supra*, Undisputed Material Facts ¶¶ 57-70 at 16-18.

[136] Utah Code Ann. § 25-6-202(2)(i) (formerly Utah Code Ann. § 25-6-5(2)(i) (2016)).

[137] Utah Code Ann. § 25-6-202(1)(a) (formerly Utah Code Ann. § 25-6-5(1)(a) (2016)).

courts look at a variety of indicia or "badges of fraud" set forth in the UVTA.[138] Courts also examine the knowledge of the transferors and the purpose of the transfer.[139]

In *In re Independent Clearing House Co.*, the district court examined transfers made by a fraudulent business entity, operating as a Ponzi scheme.[140] The district court held that the debtor knew the business was not legitimate and that "from the very nature of his activities," creditors would lose money.[141] Because of this knowledge, the only inference possible was that the transfers were made with actual intent to hinder, delay, or defraud creditors.[142]

A similar finding is appropriate in this case regarding $424,176.05 in transfers to Defendant. The Undisputed Material Facts demonstrate that the Receivership Entities made $424,176.05 in transfers to Defendant that directly related to the fraudulent solar technology and soliciting others to purchase the solar lenses.[143] These transfers include $6,176.05 in commission payments Defendant received for the sale of solar lenses;[144] $358,000.00 in bonus payments Defendant received from RaPower and Cobblestone[145] (whose only business related to the fraudulent solar scheme[146]); and a $60,000.00 consulting fee payment Defendant received from IAS[147] (which Defendant testified was related to the solar technology[148]).

---

[138] *Id*. § 25-6-202(2)(a)-(k) (formerly Utah Code Ann. § 25-6-5(2)(a)-(k) (2016)); *Breslin*, 175 F. Supp. 3d at 1319.

[139] *In re Independent Clearing House Co.*, 77 B.R. 843 (D. Utah 1987).

[140] *Id*.

[141] *Id*. at 860.

[142] *Id*.

[143] *Supra*, Undisputed Material Facts ¶ 9 at 5, ¶ 15 at 7, ¶¶ 33-36 at 11-12, ¶¶ 38-39 at 12, ¶¶ 41-43 at 13.

[144] *Id*. ¶ 9 at 5, ¶ 15 at 7, ¶¶ 38-39 at 12, ¶¶ 41-42 at 13.

[145] *Id*. ¶¶ 41-43 at 13.

[146] *Id*. ¶¶ 3-4 at 4, ¶¶ 25-28 at 9-10, ¶¶ 33-35 at 11, ¶ 62 at 17, ¶ 69 at 18.

[147] *Id*. ¶¶ 41-42 at 13.

[148] LaGrand Johnson Depo. at 113:15-114:5.

The purchase of solar lenses was the primary component of the Receivership Defendants' fraudulent tax scheme.[149] The "whole purpose of [the Receivership Entities] was to perpetuate a fraud to enable funding for Neldon Johnson. . . . [Neldon] Johnson has commingled funds between these entities, used their accounts to pay personal expenses, and transferred Receivership Property to and through them in an attempt to avoid creditors."[150]

A Ponzi Scheme has not been found in this case. Nevertheless, the Receivership Defendants and the Receivership Entities did not conduct a legitimate business regarding the solar technology.[151] The Undisputed Material Facts demonstrate that the marketing, promoting, sale, and other activities relating to the solar lenses perpetuated and expanded the Receivership Defendants' fraudulent scheme.[152] Defendant was paid $424,176.05 in commissions, bonuses, and consulting fees by the Receivership Entities which directly allowed for the marketing, promotion, and sale of the fraudulent solar technology.[153] These transfers served to perpetuate and expand the Receivership Defendants' fraudulent scheme.

Defendant argues that genuine issues of material fact exist regarding whether the Receivership Entities made these transfers with actual intent to defraud.[154] However, the only reasonable inference from the Undisputed Material Facts and record evidence is that the transfers to Defendant that related to the fraudulent solar technology were made with actual intent to hinder, delay, and defraud creditors of the Receivership Entities. "[T]he question of intent to defraud is not debatable" where the Receivership Entities were operated as a fraudulent scheme

---

[149] *Supra*, Undisputed Material Facts ¶¶ 1-28 at 4-10.

[150] *Id*. ¶¶ 25-26 at 9-10.

[151] *Id*. ¶ 27 at 10.

[152] *Id*. ¶¶ 1-28 at 4-10.

[153] *Id*. ¶ 9 at 5, ¶ 15 at 7, ¶¶ 33-36 at 11-12, ¶¶ 38-39 at 12, ¶¶ 41-43 at 13.

[154] Response at 23-26.

and the transfers to Defendant were for work that perpetuated and expanded that fraudulent scheme.[155] The only reasonable inference from the Receivership Entities' transfers to Defendant relating to the fraudulent solar technology is that the transfers were made with actual intent to hinder, delay, or defraud creditors.

Additionally, actual intent to defraud is inferred for $624,176.05 of transfers made to Defendant based upon the badges of fraud set forth in the UVTA.[156] These transfers include the Receivership Entities' $424,176.05 in transfers relating to the fraudulent solar technology (for commissions, bonuses, and consulting fees),[157] and a $200,000.00 transfer that Glenda Johnson made to Defendant using the Receivership Entities' assets.[158] Several factors exist that compel a finding of actual intent to hinder, delay, or defraud regarding each of these transfers, including:

- Defendant is the son of Neldon Johnson and was an insider of IAS (serving as the CFO from early 2000 until 2016), RaPower, and Cobblestone;[159]

- The Receivership Defendants had been sued or threatened with suit before most of these transfers to Defendant: the Internal Revenue System began a criminal investigation of the Receivership Defendants in June 2012; and the Department of Justice commenced the Criminal Enforcement Action in November 2015;[160]

- The Receivership Defendants had no legitimate business regarding the fraudulent solar technology, and had not received any revenue or income aside from the sale of solar lenses;[161]

- The Receivership Defendants have removed or concealed assets and records;[162]

---

[155] *In re Independent Clearing House*, 77 B.R. at 861 (quoting *Conroy v. Shott*, 363 F.2d 90, 91-91 (6th Cir. 1966)).

[156] *RES-NV CHLV, LLC v. Rosenberg*, No. 2:13-cv-00115-DK, 2015 WL 423284 (D. Utah Feb. 2, 2015).

[157] *Supra*, Undisputed Material Facts ¶ 9 at 5, ¶ 15 at 7, ¶¶ 33-36 at 11-12, ¶¶ 38-39 at 12, ¶¶ 41-43 at 13.

[158] *Id*. ¶¶ 46-51 at 14-15.

[159] Utah Code Ann. § 25-6-102(8) (formerly Utah Code Ann. § 25-6-2(8) (2016)); Utah Code Ann. § 25-6-202(2)(a) (formerly Utah Code Ann. § 25-6-5(2)(a) (2016)); *Supra*, Undisputed Material Facts ¶ 29 at 10.

[160] Utah Code Ann. § 25-6-202(2)(d) (formerly Utah Code Ann. § 25-6-5(2)(d) (2016)); *Supra*, Undisputed Material Facts ¶ 16 at 7, ¶ 52 at 15; Consolidated Entities Payments to LaGrand Johnson.

[161] *Supra*, Undisputed Material Facts ¶¶ 27-28 at 10.

[162] Utah Code Ann. § 25-6-202(2)(g) (formerly Utah Code Ann. § 25-6-5(2)(g) (2016)); *Supra*, Undisputed Material Facts ¶ 25 at 9; Affiliates Order at 55; Memorandum Decision and Order Granting Turnover Motion; Denying

- The Receivership Defendants falsified documents to cover up their fraud regarding the solar technology;[163]

- Prior to these transfers, beginning in at least May 1, 2009, many of the Receivership Entities (including RaPower, IAS, Cobblestone, Solco, XSun, LBT1, LBT O&M, LLC, DCL16BLT, Inc., DCL-16A, Inc., NPJFLP, Solstice, Black Night, and Starlite) were insolvent;[164]

- The $200,000.00 transfer from Glenda Johnson was not disclosed to the court in the Civil Enforcement Case; was made with funds taken from the Receivership Entities' bank accounts the same day the court in Civil Enforcement Case orally ruled that the Receivership Defendants engaged in a "massive fraud" for which they would be enjoined, and disgorgement would be ordered;[165] and the Receivership Entities did not receive reasonably equivalent value for the transfer.[166]

"The existence of one or more of these badges in a case does not necessarily constitute fraud per se, nor is the presence of one or more of the elements conclusive."[167] However, summary judgment is appropriate where "the undisputed facts support an inference of fraudulent intent."[168]

---

Motion to Strike; Overruling Objection to Authentication of Exhibits; and Overruling Objection to Rejection of Reputed Contract ("Turnover Order") at 45-47, ECF no. 1007 in Civil Enforcement Case, filed Sept. 15, 2020, docket no. 39-14, filed Feb. 24, 2022; Civil Contempt Order Re: Neldon Johnson, Glenda Johnson, LaGrand Johnson, and Randale Johnson ("Civil Contempt Order") at 5-9, 11-19, ECF no. 947 in Civil Enforcement Case, filed July 6, 2020, docket no. 39-15, filed Feb. 24, 2022.

[163] Civil Contempt Order at 8-9; Turnover Order at 41-42. Although this conduct occurred after the transfers to Defendant, it is indica of the fraudulent nature of the Receivership Defendants' conduct, their knowledge, and their efforts to conceal the fraudulent transfer of assets.

[164] Utah Code Ann. § 25-6-202(2)(i) (formerly Utah Code Ann. § 25-6-5(2)(i) (2016)); *Supra*, Undisputed Material Facts ¶¶ 57-70 at 16-18, Discussion at 26-28; Consolidated Entities Payments to LaGrand Johnson.

[165] Utah Code Ann. § 25-6-202(2)(c), (g), (j) (formerly Utah Code Ann. § 25-6-5(2)(c), (g), (j) (2016)); Utah Code Ann. § 25-6-304(2)(b)(ii) (formerly Utah Code Ann. § 25-6-9(2)(b) (2016)); *Supra*, Undisputed Material Facts ¶¶ 46-51 at 14-15. Defendant does not dispute or attempt to challenge that Glenda Johnson used the Receivership Entities' assets to make the $200,000.00 transfer.

[166] Utah Code Ann. § 25-6-202(2)(h) (formerly Utah Code Ann. § 25-6-5(2)(h) (2016)); *Infra*, Discussion at 36-37.

[167] *Bresline*, 175 F. Supp. 3d at 1319 (quoting *United States v. Barson*, No. 2:97-cv-551-SA, 1999 WL 674567, *5 (D. Utah July 16, 1999)).

[168] *Id*. (citing *Wasatch Oil & Gas, LLC v. Reott*, 163 P.3d 713, 722 (Utah Ct. App. 2007)).

Viewing the Undisputed Material Facts and reasonable inferences drawn therefrom in a light most favorable to Defendant,[169] the Receiver has produced sufficient evidence of indicia and badges of fraud to support an inference that each transfer comprising the $624,176.05 in transfers to Defendant was made with actual intent to hinder, delay, or defraud creditors. Defendant has failed to adequately dispute these indicia and badges of fraud, instead arguing only his own purported work and efforts to earn the payments he received from the Receivership Entities in good faith.[170] This does not dispute the fraudulent nature of the transfers. Rather, Defendant's assertions and arguments relate to his good faith defense.

Defendant also makes no attempt challenge the fraudulent nature of the $200,000.00 transfer made by Glenda Johnson. Defendant argues only that the UVTA does not apply to the transfer because Glenda Johnson is not one of the Receivership Defendants or Receivership Entities.[171] However, the Receiver repeatedly asserts, and Defendant does not contest, that Glenda Johnson made this transfer using the Receivership Entities' assets. And under the UVTA, fraudulently transferred assets can be recovered from a subsequent transferee, such as Defendant, if the transfer was not taken in good faith and for value.[172]

Therefore, based on the Undisputed Material Facts and record evidence, each of the transfers comprising the $624,176.05 in transfers to Defendant was fraudulent as a matter of law. Because the $624,176.05 in transfers to Defendant were made with actual intent to hinder, delay, or defraud creditors, the transfers are avoidable by the Receiver unless Defendant establishes a

---

[169] *Adler*, 144 F.3d at 670.

[170] Response at 23-29.

[171] *Id*. at 13.

[172] Utah Code Ann. § 25-6-304(2)(b)(ii) (formerly Utah Code Ann. § 25-6-9(2)(b) (2016)).

good faith defense.[173] To establish the good faith defense, Defendant must show (1) he took the transfers in good faith, and (2) for reasonably equivalent value given to the Receivership Entities.[174]

### Genuine issues of fact exist regarding whether Defendant took the $624,176.05 in fraudulent transfers in good faith

Defendant argues that genuine issues of material fact exist regarding whether he took the transfers in good faith.[175] Good faith is "measured objectively" based on whether "the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and [whether] diligent inquiry would have discovered the fraudulent purpose."[176] "A transferee who reasonably should have known of a debtor's insolvency or of the fraudulent intent underlying the transfer is not entitled to a finding of good faith."[177]

The Undisputed Material Facts include facts that strongly suggest Defendant knew or should have known, or at least inquired, about the Receivership Entities' insolvency; the Receivership Defendants' fraudulent scheme; and the fraudulent intent underlying the transfers to him.[178] But the Undisputed Material Facts also include facts capable of supporting reasonable inference that Defendant took the transfers in good faith.[179] And some of the Undisputed Material Fact are capable of supporting either the Receiver or Defendant's arguments regarding good faith.[180]

---

[173] Utah Code Ann. § 25-6-303(1)(a) (formerly Utah Code Ann. § 25-6-8(1)(a)).

[174] *Id*. § 25-6-304(1) (formerly Utah Code Ann. § 25-6-9(1) (2016)).

[175] Response at 26-29.

[176] *Layton*, 957 F. Supp. 2d. at 1319 (quoting *Jobin*, 84 F.3d at 1338).

[177] *Id*. (quoting *Jobin*, 84 F.3d at 1338).

[178] *Supra*, Undisputed Material Facts ¶¶ 15-16 at 7, ¶ 22 at 9, ¶¶ 25-31 at 9-10, ¶¶ 33-36 at 10-11, ¶¶ 38-40 at 12-13, ¶¶ 46-53 at 14-15, ¶¶ 57-65 at 16-17, ¶¶ 69-70 at 18-19.

[179] *Id*. ¶ 32 at 10-11, ¶ 37 at 12, ¶¶ 44-45 at 13-14, ¶ 54 at 15-16.

[180] *Id*. ¶ 43 at 13, ¶ 56 at 16.

"At [the summary judgment] stage, a reviewing court must examine the factual record and reasonable inferences drawn therefrom in the light most favorable to the non-moving party, but it may grant summary judgment when the record taken as a whole couldn't lead a rational trier of fact to find for the non-moving party."[181] "A court's proper role thus involves determining whether a jury could reasonably find that the plaintiff proved his case by the quality and quantity of the evidence."[182]

On this record, genuine issues of fact exist regarding whether Defendant took the $624,176.05 in fraudulent transfers in good faith. But the existence of these factual issues does not itself preclude summary judgment in favor of the Receiver. This is because the good faith defense requires that Defendant also show that reasonably equivalent value was given to the Receivership Entities for the transfers.[183]

### Genuine issues of material fact exist regarding whether reasonably equivalent value was given for $424,176.05 of the fraudulent transfers

"[I]n determining whether reasonably equivalent value was given, the focus is on whether the *debtor received* reasonably equivalent value from the transfer."[184] "[T]he question is not whether [the transferee] 'gave reasonably equivalent value; it is whether [the debtor] received reasonably equivalent value.'"[185] "The primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved."[186] And "[t]he

---

[181] *Sidlo v. Millercoors, LLC*, 718 Fed. App'x 718, 726 (10th Cir. 2018).

[182] *Id.*

[183] Utah Code Ann. § 25-6-304(1) (formerly Utah Code Ann. § 25-6-9(1) (2016)).

[184] *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1276 (D. Utah 2015) (emphasis in original).

[185] *Michelle Turpin & Assocs., P.C.*, 2016 WL 3661226, at *7 (quoting *Klein v. Cornelius*, No. 2:11-cv-01159-DAK, 2013 WL 6008304, at *3 (D. Utah Nov. 13, 2013)).

[186] *Cornelius*, 786 F.3d at 1321.

UFTA states that '[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied.'"[187]

Defendant argues that genuine issues of material fact exist regarding the $424,176.05 in fraudulent transfers (for commissions, bonuses, and consulting fees) the Receivership Entities made to him based on the labor and services he performed in exchange for the transfers.[188] In other words, Defendant argues that because the transfers satisfied debts the Receivership Entities owed to him for his work, reasonably equivalent value was given.[189] The Receiver counters this argument by citing to Defendant's deposition testimony which indicates that these transfers were not contracted for as part of Defendant's employment.[190]

The Receiver's cited evidence strongly suggests that the $424,176.05 in fraudulent transfers for commissions, bonuses, and consulting fees did not satisfy an antecedent debt the Receivership Entities owed to Defendant. And as such, the transfers would not have preserved the Receivership Entities' net worth, but rather, negatively impacted the net worth. Nevertheless, the facts and evidence the Receiver relies on were submitted in a supplemental brief.[191] They were not presented as undisputed material fact in the Receiver's Motion for Partial Summary Judgment. On the record created on the Motion for Partial Summary Judgment, the Receiver has not submitted sufficient undisputed material facts and evidence to permit a finding that the $424,176.05 in fraudulent transfers did not satisfy an antecedent debt the Receivership Entities

---

[187] *Georgelas*, 45 F.4th at 1199 (quoting Utah Code Ann. § 25-6-4 (2016)).

[188] Response at 26-29.

[189] Defendant's Supplemental Memorandum in Opposition to Motion for Summary Judgment at 2-6, docket no. 62, filed Sept. 13, 2022.

[190] Supplemental Memorandum in Support of Receiver's Motion for Partial Summary Judgment Re: *Georgelas v. Desert Hill Ventures, Inc.* at 3-6, docket no. 63, filed Sept. 13, 2022.

[191] *Id.*

owed to Defendant based on his employment, or that such transfers were part of an illegal contract. The scope of Defendant's employment contract and the debt owed to Defendant for his employment are not fully developed by the Undisputed Material Facts. However, the facts raised in the supplemental brief will, unless contested effectively, almost surely compel a conclusion at trial that the $424,176.05 in fraudulent transfers did not satisfy an antecedent debt.

Therefore, genuine issues of material fact exist regarding whether Defendant provided reasonably equivalent value for the $424,176.05 in fraudulent transfers for commissions, bonuses, and consulting fees made by the Receivership Entities. The Receiver's Motion for Partial Summary Judgment[192] is DENIED in part regarding these transfers.

### Reasonably equivalent value was not given for the $200,000 fraudulent transfer made by Glenda Johnson

The Undisputed Material Facts demonstrate that Glenda Johnson withdrew substantial funds from the Receivership Entities' bank accounts and subsequently transferred $200,000 of those funds to Defendant.[193] Defendant makes no attempt to identify any value given or benefit the Receivership Entities received in exchange for the assets Glenda Johnson withdrew from the Receivership Entities, or the $200,000.00 fraudulent transfer that Glenda Johnson made to Defendant using those assets. And there is no evidence to allow reasonable inference that these transfers secured or satisfied an antecedent debt. The only reasonable inference from the Undisputed Material Facts is that the transfers did not preserve the Receivership Entities' net worth. The transfers had a negative impact on the Receivership Entities' net worth.

Therefore, the Receivership Entities did not receive reasonably equivalent value for the $200,000 fraudulent transfer that Glenda Johnson made to Defendant as a matter of law. Because

---

[192] Docket no. 39, filed Feb. 24, 2022.

[193] *Supra*, Undisputed Material Facts ¶¶ 46-51 at 14-15.

the Receivership Entities did not receive reasonably equivalent value for the $200,000 fraudulent transfer, Defendant's good faith defense regarding the transfer fails as a matter of law. The Receiver is entitled to avoid the $200,000 fraudulent transfer on his claim under Utah Code Ann. § 25-6-202(1)(a) and Utah Code Ann. § 25-6-5(1)(a) (2016).

Additionally, because Glenda Johnson removed the assets from the Receivership Entities and made the $200,000 transfer to Defendant at a time the relevant Receivership Entities were insolvent and reasonably equivalent value was not given,[194] the Receiver is entitled to avoid the $200,000 fraudulent transfer under Utah Code Ann. § 25-6-203(1) and Utah Code Ann. § 25-6-8 (2016).

Therefore, the Receiver's Motion for Partial Summary Judgment[195] is GRANTED in part. Judgment will be entered in the Receiver's favor and against Defendant in the amount of $200,000 on a portion of the Receiver's first cause of action under Utah Code Ann. § 25-6-202(1)(a) and Utah Code Ann. § 25-6-5(1)(a) (2016), and on a portion of the Receiver's third cause of action claim under Utah Code Ann. § 25-6-203(1) and Utah Code Ann. § 25-6-8 (2016).

### The Receiver is entitled to prejudgment interest on the $200,000 fraudulent transfer made by Glenda Johnson

The Receiver is entitled to an award of prejudgment interest on the $200,000 fraudulent transfer Glenda Johnson made to Defendant.[196] Defendant does not dispute the Receiver is

---

[194] *Id*. ¶¶ 46-51 at 14-15, ¶¶ 57-70 at 16-18.

[195] Docket no. 39, filed Feb. 24, 2022.

[196] *Wing v. Gillis*, 525 Fed. App'x 795, 801 (10th Cir. 2013) (upholding award of prejudgment interest to receiver because prejudgment interest "compensates for the loss of use of the money" and "[u]nder fairness and equity principles, prejudgment interest was proper"); *Miller v. Kelley*, No. 1:12-cv-00056-DN, 2014 WL 5437023 (D. Utah Oct. 27, 2014) (awarding prejudgment interest to receiver who obtained judgment under Utah's voidable transfers act); *Klein v. Widmark*, No. 2:11-cv-01097-CW, 2016 WL 845317 (D. Utah Mar. 2, 2016) (same).

entitled to prejudgment interest. For simplicity of calculation, prejudgment interest is awarded at the rate of 5% per annum[197] on the entire amount of $200,000, from the date the transfer was received by Defendant.

**Genuine issues of material fact exist regarding the
remaining $1,704,351.79 in transfers made to Defendant**

As discussed, a transfer is voidable under the UVTA if the debtor made the transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor."[198] A transfer is also voidable under the UVTA when the debtor does not receiver reasonably equivalent value in exchange for the transfer and the debtor was insolvent.[199]

Based on the Receivership Entities' records, the Receiver itemized the $2,128,527.84 in transfers the Receivership Entities made to Defendant into seven categories:

- $6,176.05 in commissions for selling solar lenses;
- $85,019.36 in cash payments;
- $358,000.00 in bonuses;
- $60,000.00 for consulting;
- $364,957.52 in wages, salary, and benefits;
- $314,086.46 for research and development and reimbursements;
- $940,288.45 for other payments.[200]

The Receiver has established that $424,176.05 of these transfers (for commissions, bonuses, and consulting fees) were directly related to the fraudulent solar scheme and were fraudulent as a matter of law.[201] However, the Receiver has not sufficiently identified the purpose of and intent

---

[197] *Gillis*, 525 Fed. App'x at 801 (finding court did not abuse discretion in awarding prejudgment interest at the rate of 5%).

[198] Utah Code Ann. § 25-6-202(1)(a) (formerly Utah Code Ann. § 25-6-5(1)(a) (2016)).

[199] *Id*. §§ 25-6-202(1)(b), -203(1) (formerly Utah Code Ann. §§ 25-6-5(1)(b), -6(1) (2016)).

[200] *Supra*, Undisputed Material Facts ¶¶ 41-42 at 13.

[201] *Id*. Discussion at 28-33.

behind the remaining $1,704,351.79 in transfers made to Defendant. Defendant asserts these payments were for his work on projects including, but not limited to telemedicine; communication; fingerprint technology; self-checkout systems in grocery stores and restaurants; solar energy; and geothermal energy.[202] Thus, some of the remaining $1,704,351.79 in transfers to Defendant may have related to the fraudulent solar scheme, while others did not.

In his Reply, the Receiver concedes that genuine issues of material facts exist regarding whether the $1,704,351.79 in transfers to Defendant were made with actual intent to defraud creditors.[203] Genuine issues of material facts also exist regarding whether Defendant provided reasonably equivalent value for these transfers and took the transfers in good faith. Because of the existence of genuine issues of material fact regarding the remaining $1,704,351.79 in transfers to Defendant, the Receiver's Motion for Partial Summary Judgment[204] is DENIED in part.[205]

## ORDER

IT IS HEREBY ORDERED that the Receiver's Motion for Partial Summary Judgment[206] is GRANTED in part. Judgment will be entered in the Receiver's favor and against Defendant on a portion of the Receiver's first cause of action under Utah Code Ann. § 25-6-202(1)(a) and Utah Code Ann. § 25-6-5(1)(a) (2016), and on a portion of the Receiver's third cause of action claim under Utah Code Ann. § 25-6-203(1) and Utah Code Ann. § 25-6-8 (2016). The judgment

---

[202] *Id*. Undisputed Material Facts ¶¶ 31-32 at 10-11.

[203] Reply Memorandum in Support of Receiver's Motion for Partial Summary Judgment ("Reply") at 9, 11-12, docket no. 51, filed May 26, 2022.

[204] Docket no. 39, filed Feb. 24, 2022.

[205] This determination is consistent with the determinations in similar cases brought by the Receiver involving alleged fraudulent transfers made by the Receivership Entities. *See e.g. Taylor*, 2022 WL 580472; *Snow*, 2022 WL 580457.

[206] Docket no. 39, filed Feb. 24, 2022.

entered in favor of the Receiver and against Defendant will be in the amount of $200.000; plus prejudgment interest at the rate of 5% per annum from the date the transfer was received by Defendant; and post judgment interest from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

IT IS FURTHER ORDERED that the Receiver's Motion for Partial Summary Judgment[207] is DENIED in part. Genuine issues of material fact exist regarding the remaining $2,128,527.84 in alleged fraudulent transfers to Defendant.

IT IS FURTHER ORDERED that by no later than Friday March 31, 2023, the parties shall meet, confer, and jointly file a report stating the status of the case moving forward, including a proposed schedule.

Signed March 16, 2023.

BY THE COURT

David Nuffer
United States District Judge

---

[207] Docket no. 39, filed Feb. 24, 2022.